**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

VEGA CAPITAL LONDON LIMITED and ADRIAN SPIRES,

*Movants,*

v.

GLENCORE LTD.,

*Respondent.*

Case No. 1:24-cv-2628

Hon. Manish S. Shah

**VEGA CAPITAL LONDON LIMITED AND ADRIAN SPIRES' REPLY IN SUPPORT OF THEIR MOTION TO COMPEL PRODUCTION OF DOCUMENTS**

There is no good reason why Glencore should be immune from producing documents that go to the heart of the defense in this case. Glencore argues that its documents are confidential, that Vega and Spires have not met their burden of showing relevance or that Glencore's documents are necessary, and that a protective order is not sufficient to mitigate the potential harm of disclosure. All of these arguments fall well short of the mark.

First, documents with confidential information are not immune from discovery, particularly when they are relevant and necessary for a litigant to mount its defense.

Second, as Vega and Spires have repeatedly explained, Glencore's trading records are relevant to a critical issue in this case – why there was no demand for the May WTI Contract and therefore why there was no artificial price. Glencore has chosen to ignore those explanations, accusing Vega and Spires of asking "rhetorical" or "vague" questions. Glencore's documents will help explain – from the perspective from one of the largest traders in the market – why sophisticated traders did not want to be paid in exchange for accepting oil that could later be resold by those traders at a further profit. The documents will help refute Plaintiff's arguments that traders believed there was plenty of available storage in Cushing, Oklahoma and that large

traders were simply being economically irrational when they refused to be paid to take ownership of the crude oil in the May contract. The documents will also help disprove Plaintiff's contention that a lack of liquidity caused a "flash crash" in the marketplace in the last six minutes of the trading day. These are not rhetorical arguments, as Glencore suggests, but rather efforts to obtain evidence needed to negate essential elements of Plaintiff's market manipulation and Sherman Antitrust claims. The case law directly supports Vega and Spires on these points.

Third, Glencore's arguments about necessity are wrong because they fail to grapple with the importance of corroborating evidence. It is true that Vega and Spires can make general arguments that there was a vast over-supply of oil and a total lack of demand for it from general industry resources. But Vega and Spires also need to refute Plaintiff's competing theories about what happened in the market on that day (including its theories about a lack of liquidity and about the abundance of storage for oil). That is why Vega and Spires are seeking evidence from "major players" in the market, as Glencore refers to itself. Vega and Spires are seeking evidence that these major players did not have demand for oil on April 20, 2020 and that they believed there was no available storage, which is why the price of the May WTI contract fell as far as it did. This case cannot be fairly litigated without Vega and Spires being permitted to obtain corroborating evidence from non-party traders that could prove to be the difference in the case.

Finally, Glencore’s claim that the protective order entered in the case will not protect its “highly confidential” information is a nonstarter. Glencore cannot demonstrate that it would suffer any harm – let alone “significant” or “substantial” harm – by producing the subpoenaed information. Glencore's argument was rejected in the past by federal district courts in New York and Texas. The lack of a significant harm is particularly true in this case because the subpoena seeks information about the trading of only one contract on two days in the market on an

unprecedented day from four years ago. Given their extraordinary breadth, Glencore's arguments would effectively confer immunity upon it from providing any information in civil discovery about nearly any aspect of its operations. No one – not even "a major player" like Glencore – should be given that kind of immunity in civil cases, particularly when addressing the important public question of why the price of the May WTI Contract went negative for the first time while in the midst of a worldwide pandemic.

## DISCUSSION

### A. The Confidential Nature of Glencore's Records Does Not Preclude Production

Like Vitol, Glencore argues that the production of its records should not be compelled because they are "confidential information or trade secrets." ECF 19 at 4-6. But confidential records can be produced when they are relevant to the underlying claims and a protective order is in place. *Fed. Open Mkt. Comm. of the Fed. Reserve Sys. v. Merrill*, 443 U.S. 340, 362 (1979) ("[T]here is no absolute privilege for trade secrets and similar confidential information."). Glencore's four cases do not support its position:

- One case has nothing to do with compelling the production of confidential materials. *Aspen Mktg. Servs., Inc. v. Russell*, No. 09 C 2864, 2009 WL 4674061, at *8 (N.D. Ill. Dec. 3, 2009) (deciding whether to dismiss a trade secret claim under Fed. R. P. 12(b)(6)).

- Another case addresses whether the court should mandate disclosure of discovery materials to a third party newspaper that was curious about their contents. *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 164 F.R.D. 346, 358 (S.D.N.Y. 1996).

- A third case addresses whether information should be provided if the information was not relevant to the case. *Quantlab Techs. Ltd. v. Godlevsky*, No. 4:09-CV-4039, 2012 WL 12894142, at *1-2 (S.D. Tex. Feb. 27, 2012).

- The fourth case addresses whether a company's "operating and strategic plans" for three years may be withheld from discovery if they were only "tenuously related" to one claim in the case. *Grand River Enters. Six Nations, Ltd. v. King*, No. 02 CIV 5068(JFK), 2009 WL 222160, at *4-5 (S.D.N.Y. Jan. 30, 2009).

These latter two cases are distinguishable from this case because, among other things, the discovery sought in this case is directly relevant and necessary to Vega and Spires' defense.

### B. Glencore Creates Straw Man Arguments to Dispute the Relevance of the Discovery Sought

Glencore's relevance arguments depend upon it ignoring what Vega and Spires have repeatedly explained to its counsel and argued before the Court. ECF 19 at 7-10. For instance, Glencore claims that Vega and Spires "have not proffered a concrete reason for why Glencore's trading information is relevant to an anticipated analysis by its experts, or how or in what way that information would tend to disprove plaintiff's allegations" and instead offer "a menu of rhetorical questions concerning Glencore's motives that are not connected to any analysis." ECF 19 at 7. But Glencore's argument is simply false. Vega and Spires have repeatedly explained the relevance of this evidence and how it ties to refuting Plaintiff's claims of market manipulation and antitrust violations. *See, e.g.*, ECF 2 at 8-11; *Vitol Inc. v. Vega Capital London Ltd.*, No. 1:24-cv-01492, ECF 7 at 9-12; ECF 20 at 12-16. Glencore's documents are directly relevant to show (i) why there was no significant demand for oil futures contracts even amongst the largest traders (like Glencore); (ii) whether Glencore's traders believed there was available storage in Cushing, Oklahoma; and (iii) why there was no artificial price in the market on April 20, 2020.[1]

---

[1] Glencore argues that this point is somehow "vague." ECF 19 at 7, 11. This is a rhetorical device that Glencore frequently uses throughout its response. Glencore (i) ignores the explanations that Vega and Spires have given or claims that their explanations are vague; and (ii) then claims Vega and Spires have not explained why they need the information or why they cannot get it from other sources. *See, e,g.*, ECF 19 at 4 (claiming Vega and Spires' brief "fails to meaningfully engage with the points raised by Vitol concerning the availability of the information from alternative sources and the lack of relevance of the information sought to the underlying litigation"); *id.* at 9 ("Yet Movants do not even explain how the answers to those rhetorical questions connect to plaintiff's claims or would be utilized in Movants' defense"); *id.* at 12 ("Movants offer no reason, and none is apparent, why it is 'necessary' that Movants obtain the same data from Glencore, or to know which of those trades were made by Glencore"); *id.* at 15

Glencore is wrong to suggest these issues are "rhetorical" questions. It is a fact that, on April 20, 2020, when the prices of the May WTI contract were negative, Glencore, Vitol, and other massive traders (with more market power than ten individual traders in London could ever imagine) did not purchase enough of the May WTI Contract to raise the prices above -$37.63 per barrel. Why not? There is a concrete answer to that concrete question, and Vega and Spires are utilizing the discovery process to obtain the answer. Plaintiff contends that there was available storage for the oil and implies that large market participants like Glencore and Vitol were simply irrational for not agreeing to "buy" more oil. *Mish Int'l Monetary Inc. v. Vega Capital London Limited*, No. 1:20-cv-4577, ECF 318 at 40 (claiming that assertions about the lack of storage at Cushing are "deeply flawed"). To refute Plaintiff's claims, Vega and Spires are seeking tangible evidence that even large traders like Glencore did not believe there was available storage in Cushing, Oklahoma and that was one reason why there was not more demand for the oil. Vega and Spires also need access to Glencore's materials to rebut Plaintiff's argument that there was a "flash crash" in the market of the May WTI Contract and that "there [wa]s an extreme lack of liquidity" from large traders like Vitol, Glencore, and others. *Mish* ECF 318 at 4.

Glencore argues that its "*reasons* for trading or not trading" are not required to establish "overall market supply and demand," ECF 19 at 8, but that argument forgets that "overall market supply and demand" is aggregated from the supply and demand of every trader in the market. By presenting evidence of representative samples of supply and demand from the perspectives of individual significant traders (like Glencore), Vega and Spires will be able to illustrate why the demand in the market fell on April 20, 2020 in the way that it did. This is exactly the point that Judge William Pauley made in the *Parnon* case when he observed that "[f]ar from being

("In light of Movants' failure to make *any* showing that Glencore's information is essential to this case . . .").

irrelevant, documents indicating the perceptions and reactions of 'innocent' non-party traders are highly probative of whether this phenomenon occurred and how it impacted the market." *U.S. Commodity Futures Trading Comm'n v. Parnon Energy Inc.*, No. 11 CIV. 3543(WHP), 2013 WL 5882921, at *3 (S.D.N.Y. Oct. 25, 2013), *aff'd*, 593 F. App'x 32 (2d Cir. 2014).

Despite the best efforts of Vitol and Glencore, the *Parnon* case is not distinguishable in any meaningful way. ECF 19 at 9-10. Just like this case, *Parnon* considered the relevance of information from third-party market participants. *Parnon*, 2013 WL 5882921, at *3. The same relevance standard applies under both Rule 26 or Rule 45.[2] Just like in this case, there was a dispute in *Parnon* over what was happening in the WTI market, including whether it was the product of market manipulation. *Id.* at *3. Glencore quibbles that the facts in *Parnon* involved a switch from backwardation to contango, ECF 19 at 9, but Judge Pauley's reasoning did not rise or fall based on the precise market phenomenon at issue. What mattered is that non-party traders possessed information relevant to understanding what was happening in the market, which is true both in *Parnon* and this case.[3]

---

2 *Architectural Iron Workers' Local No. 63 Welfare Fund v. Legna Installers Inc.*, No. 22 C 5757, 2023 WL 2974083, at *4 (N.D. Ill. Apr. 17, 2023) ("The information Plaintiffs request in their subpoenas are generally relevant to this litigation within the meaning of Rule 26(b)(1), which applies 'with equal force to nonparty discovery under Rule 45.'") (citation omitted); *Bouto v. Guevara*, No. 19-CV-2441, 2021 WL 131418, at *2 (N.D. Ill. Jan. 14, 2021) ("[T]he relevance and proportionality limits in Rule 26 that guide the proper scope of discovery apply with equal force to nonparty discovery under Rule 45"). Vitol's counsel was similarly mistaken at oral argument when he suggested that *Parnon* was distinguishable because "*Parnon* was analyzed under Rule 26, a general discovery standard, not a Rule 45 standard." *Vitol* ECF 20 at 29:10-12.

3 Glencore also places heavy reliance on the fact that the CFTC had already disclosed the non-traders' information to the defendant in *Parnon* and that it would have been unfair not to allow the plaintiff in the case to view the same documents. ECF 19 at 10. But there is nothing in *Parnon* to suggest that the district court thought that fact was "crucial" or dispositive. If the district court was concerned about the production of confidential information or believed it could ruin the non-traders' business, it could have used its inherent authority to bar the defendant from using it or ordered the defendant to return the information to the CFTC.

Glencore also tries to dismiss Judge Gray Miller's decision in the Southern District of Texas as "inapposite for the same reasons as *Parnon*." ECF 19 at 10 n.4. But Judge Miller took an independent look at the issue and specifically examined relevance from the perspective of Rules 26 and 45. *In re Subpoenas to Plains All Am. Pipeline*, *L.P.*, No. 1:11-CV-03543-WHP, 2014 WL 204447, at *5 (S.D. Tex. Jan. 17, 2014). Judge Miller reached the same conclusion as *Parnon*, concluding that a pipeline company's "role in the physical and futures market during the time period at issue, which would yield or could lead to the discovery of evidence regarding deliverable supplies and market conduct, is discoverable in the enforcement and class actions." *Id.* The same reasoning should apply here.

Meanwhile, Glencore could not identify a single case to support its theory that information from non-party traders is irrelevant to determining the existence of demand in a trading market. Glencore cites to *Little v. JB Pritzker for Governor*, No. 18 C 6954, 2020 WL 1939358, at *8 (N.D. Ill. Apr. 22, 2020), ECF 19 at 7, but that case dealt with a subpoena in a race discrimination and harassment case which was seeking information unrelated to the plaintiffs' claims about being placed in an unsafe neighborhood. That case has no applicability here.

In its zeal to protect its information, Glencore tries to mount obstacles for Vega and Spires that are not required by the law and not consistent with the facts. Glencore's straw man arguments include the following:

- Glencore suggests that Vega and Spires should not be permitted to obtain Glencore's trading information if Vega and Spires cannot obtain information from every trader on the market. ECF 19 at 8 (arguing Glencore is only "potentially one small data point" and a "single market participant"). But there is no legal principle preventing Vega and Spires from using evidence obtained from Glencore as an example of what was motivating market participants in the NYMEX market and what was actually driving the lack of demand in the market.

- Glencore argues that Vega and Spires should be required to prove how an expert would use Glencore's data in his or her "anticipated analysis." *See, e.g.*, ECF 19 at 7, 12. But Vega and Spires are permitted to obtain discovery from third parties to present directly to the jury, regardless of whether they use an expert to separately analyze it. A jury may be most persuaded about the true reasons for lack of demand based on the testimony of individual traders. In any event, Vega and Spires have no legal burden to produce or explain its expert analysis to Glencore while seeking discovery from Glencore.

- Glencore suggests that Vega and Spires did not demand information about other days *not* at issue and therefore should not be permitted to demand information about days at issue in the complaint. ECF 19 at 10 (Glencore's contention that "[t]he Subpoena is also directed to information concerning April 20 and 21, 2020, the dates of the alleged market manipulation, and the requested information therefore would not provide a 'benchmark for activity in a non-manipulated market.'"). Vega and Spires' efforts to limit the scope of subpoena should be commended, not used as a reason to avoid legitimate discovery requests.

- Glencore overstates the nature and amount of information that Vega and Spires seek. Glencore claims that Vega and Spires are seeking "the identities of Glencore's suppliers and customers and vendors, sources of supply, storage locations and positions, locations of delivery, prices, credit terms, counterparty analyses, timing, or freight costs," ECF 19 at 9, but that is not a reasonable reading of a subpoena seeking documents "sufficient to show" how and why Glencore traded the May WTI Contract on April 20 and 21, 2020. Glencore's goal is not to produce a single document in this case.

Glencore also relies on a series of inconsistent arguments. For instance, Glencore argues that its business reasons for trading are "specific to its own business," ECF 19 at 8, but implies that its information would be repetitive of other subpoena recipients. ECF 19 at 11-12 (complaining that "Movants had also received documents from at least fifteen other market participants in response to identical subpoenas"); *id.* at 2. As an initial matter, Glencore cannot have it both ways: either its information is unique or it is not. More importantly, that is exactly why Vega and Spires sought information from 28 different large traders. To the extent that Glencore's reasons for trading the May WTI Contract are unique from other traders, its documents will allow Vega and Spires to present a nuanced picture of what was motivating supply and demand on NYMEX for the May WTI Contract that day. To the extent that

Glencore's reasons for trading are similar to the reasons of other large traders, it will help to show that there were common market-wide reasons for the lack of demand for the May WTI Contract on April 20, 2020 and that the drop in price was not the result of market manipulation. That is why Vega and Spires have always emphasized the importance of gathering evidence form a cross-section of large traders, not just one or two or five. *See, e.g.*, ECF 2 at 4-5.

Finally, with respect to the issue of class certification, Glencore agrees that it "has little in common" with Plaintiff, ECF 19 at 10, but declines to provide discovery showing that to be true. While it is unclear now if Glencore is a putative class member or not,[4] Glencore's information is relevant to class certification because it demonstrates the different ways that traders can hedge trades and make money, regardless if they met Plaintiff's new proposed class definition. *Mish* ECF 318 at 1; *Glencore* ECF 19-3 at ¶ 7 ("Trading of derivative contracts such as the WTI Contract does not occur in a vacuum, but is often connected to hedging or other strategies that are closely linked with trading of the physical commodity."). Glencore's brief acknowledges the complexity of oil futures trading and provides an example of how different traders might have different strategies with different goals. *See, e.g.*, ECF 19 at 8 (offering the example of a Glencore trader who "purchased a May WTI Contract to hedge an agreement for the physical sale and delivery of crude oil to a customer in Texas"). Glencore's position as "one of the world’s largest natural resource companies, with operations around the globe engaged in trading physical commodities," ECF 19 at 1, is particularly important to show how some traders may have had the capacity or goal to accept physical delivery of oil while others did not. Vega and

[4] After Vega and Spires served their subpoena on Glencore, Plaintiff sought the certification of a narrower class than it had previously proposed in the Second Amended Complaint. *Compare Mish* ECF 318 at 1 with *Mish* ECF 130 at ¶ 334. Without receiving any discovery from Glencore, Vega and Spires cannot know whether Glencore is a putative member of this narrower proposed class.

Spires should be entitled to explore that complexity in discovery while analyzing the typicality of Plaintiff's claims and the other elements needed to certify a class.

### C. **Glencore's Information Is Necessary to Show Why Individual Traders Did Not Have a Demand for Oil on April 20, 2020**

Glencore asserts that Vega and Spires have not shown Glencore's production is "necessary" because they could make generalized arguments about the nature of the supply and demand on April 20, 2020 from other industry sources. *See, e.g.*, ECF 19 at 11-12 (arguing that Vega and Spires should rely on sources identified in an affidavit of Vitol's commercial analyst manager and its outside expert); *id.* at 2. However, *Parnon* and *Plains All Am. Pipeline* are again directly on point, concluding that the "highly probative" value of the evidence outweighed the interest of the non-party traders in not producing their confidential information. *Parnon*, 2013 WL 5882921, at *3 ("The protective orders limiting highly confidential documents to the parties' attorneys, experts, witnesses, authors and recipients of a document and one employee of each party strikes a balance between protecting the non-party objectors' competitive information while allowing for the robust and fair litigation of Plaintiffs' claims"); *Plains All Am. Pipeline*, 2014 WL 204447, at *5 (observing the national importance of adjudicating market manipulation claims about WTI oil, "a commodity that is central to the functioning of the world economy" and reasoning that "[t]he importance of the litigation cannot be overlooked in assessing the plaintiffs' need for the testimony against [the pipeline's] relative burdens").

Moreover, this is another inconsistent argument by Glencore, who repeatedly admits in its brief that there is no place where Vega and Spires can locate the reasons concerning why "major players" – such as Glencore or other large traders – traded the way that they did. *See, e.g.*, ECF 19 at 1 ("information concerning the capabilities, resources, and decision-making of a major player such as Glencore is highly coveted, and Glencore goes to great lengths to protect

it"); *id*. at 9 ("that information is highly confidential and proprietary and would never be shared with competitors or consultants in this industry").

In making these arguments, Glencore ignores the necessity of obtaining corroborating evidence while defending a litigation. The purpose of discovery is to allow a party to obtain evidence corroborating their claims and refuting their adversary's claims. *Surgery Ctr. At 900 N. Michigan Ave., LLC v. Am. Physicians Assurance Corp., Inc.*, 317 F.R.D. 620, 626 (N.D. Ill. 2016) (collecting various cases where parties have been permitted to seek discovery to corroborate their claims or contradict their adversary's claims). In defending its own cases, Glencore surely must understand the necessity of obtaining corroborating evidence. Cases can be won or lost based on the existence – or absence – of corroborating evidence. Expert testimony can be buttressed or undermined by the testimony of fact witnesses. In this case, Vega and Spires have every reason to expect that the fact testimony of individual trading firms will corroborate expert testimony from the defense and refute the theories of Plaintiff's expert. That is why this case cannot fairly proceed without Vega and Spires being permitted to obtain evidence corroborating its defenses as to why there was no demand for oil on April 20.

Meanwhile, Glencore's "necessity" cases are readily distinguishable. These cases involve far broader requests about more sensitive information over longer periods of time than at issue here. *See, e.g.*, *Stanley Works v. Newell Co.*, No. 92 C 20157, 1992 WL 229652, at *2 (N.D. Ill. Aug. 27, 1992) (subpoena sought four years' worth of information about wide swaths of a non-party's business, including "annual dollar volume of U.S. sales" of twenty-four separate types of products); *Concord Boat Corp. v. Brunswick Corp.*, No. 96 C 6026, 1996 WL 705260, at *3 (N.D. Ill. Dec. 4, 1996) (reasoning there was no necessity of the documents when "Concord is seeking almost six years' worth of documents from an unenumerated set of NMMA members,

covering data on revenues, expenses, profits, and losses from various types of marine equipment"). The nature of the highly confidential information in those cases was easily accessible and did not need any significant extrapolation. And the need for the requested information was weak. *See, e.g.*, *Litton Indus., Inc. v. Chesapeake & Ohio Ry. Co.*, 129 F.R.D. 528, 531 (E.D. Wis. 1990) (concluding that information sought for damage calculations was not necessary where, among other things, the subpoena recipient's "place in the competitive market is not equal to, nor a yardstick for, what [the subpoenaing party]'s could have been").

None of that is true here. The need to protect Glencore's information is not nearly as strong as the need in the cases above. In contrast to those cases, Vega and Spires have made a narrow request for information about one contract on two unprecedented days in the market from four years ago – when the world was digesting the onset of a pandemic amidst an oil price war between Russia and Saudi Arabia. This kind of limited production from Glencore will not provide anyone with a comprehensive understanding of Glencore's business. When Glencore produces information about one product over these two days, no one will be able to make any reasonable extrapolation about how Glencore trades that one product during normal times, let alone how Glencore trades all of the other products in the oil industry.

Moreover, Vega and Spires have a much stronger need for this evidence because it is not available elsewhere. The CME has advised that its data of individual large traders is not necessarily complete, ECF 2 at 10-11, and Glencore itself acknowledges that the reasons behind any traders' actions are not publicly available, *see, e.g.*, ECF 19 at 9. As Vega and Spires explained in their moving brief, while analyzing the macroeconomic factors on April 20, 2020, the CFTC expressly disclaimed any attempt to understand the root cause for the movement of the price of the May WTI Contract – an effort which would require evidence from individual traders

about their reasons for trading. ECF 2 at 3; *see also* ECF 3-1 at 1 n.1. Because Vega and Spires need this evidence to corroborate their defenses, and because that interest far outweighs Glencore's privacy interests in how it traded one product over two unprecedented days, the subpoena seeks material necessary to defend against the allegations in this lawsuit.

### D. The Protective Order Would More Than Adequately Protect Glencore's Confidential Information

Finally, Glencore's complaints about the protective order do not justify its wholsesale refusal to produce any documents in response to the subpoena. ECF 19 at 12-15. The *Parnon* and *Plains All Am. Pipeline* decisions apply with equal force to Glencore's arguments about the adequacy of the protective order. Like here, in *Parnon*, the non-party traders "claim[ed] their release [of their documents concerning WTI trading] would still be harmful because it could help competitors evaluate their current practices." *Parnon*, 2013 WL 5882921, at *3. Like here, the non-party traders complained that "counsel will require interpretation of the documents from their clients and that such information will always remain in the back of their minds." *Id.* But Judge Pauley rejected those claims because the "non-party objectors fail[ed] to articulate a 'defined, specific and serious injury' that warrants excluding their business information from limited review as contemplated by the protective orders, strictly for litigation purposes" and instead the non-party objectors "speculate[d] as to the parties' impermissible use of their information for competitive purposes, despite the fact that such use would be a clear violation of the protective orders currently in place." *Id.* Judge Miller reached the same independent conclusion in the Southern District of Texas, observing that the pipeline company had "not shown an identifiable risk that its information, albeit sensitive, will be used for improper business purposes in violation of the protective order." *Plains All Am. Pipeline*, 2014 WL 204447, at *6.

The same reasoning should hold true here. Glencore has no basis to support its speculation that any of the parties in the case will violate the protective order, including its prohibition that the information will only be used in connection with this case. Moreover, like Vitol, Glencore dramatically overstates the dangers to its business presented by a limited production of its trading records. ECF 19 at 1. *Parnon* involved 1.4 million records from years of operations of Vitol. Exh. 1 at 14. After the production of these documents, Vitol thrived and made billions of dollars in profits. *Vitol* ECF 7 at 6. This case will involve far fewer documents, and involves no reasonable prospect that anyone could use those documents to reverse engineer Glencore's business.[5] Glencore admits that it voluntarily uses confidentiality agreements to protect the confidential information existing in the minds of its employees who subsequently leave Glencore and work for competitors. ECF 19-3 at ¶ 15. Functionally, that is not meaningfully different than the protections offered by the Court's protective order.

Finally, the breadth of Glencore's claims would essentially confer immunity upon it from nearly any third party discovery about its actions as a trader on the NYMEX market. ECF 19 at 9 (cataloguing examples of twelve categories of information that Glencore claims would significantly harm its business if disclosed). Glencore claims that disclosing "prices" or storage positions would be "highly confidential and proprietary, and would never be shared with competitors or consultants in this industry." *Id*. Glencore is essentially arguing that it should not

---

5 That alone distinguishes this case from others cited by Glencore. *See, e.g.*, *Cont'l Auto. Sys., U.S., Inc. v. Omron Auto. Elecs., Inc.*, No. 14 C 3731, 2014 WL 2808984, at *1 (N.D. Ill. June 20, 2014) (subpoena sought "a wide variety of technical, proprietary information" in a patent case); *Suture Express, Inc. v. Cardinal Health 200, LLC*, No. 14-CV-04737, 2014 WL 6478077, at *5 (N.D. Ill. Nov. 18, 2014) ("broad subpoena" seeking "information regarding sales, profits, and market share" was "not necessary" when the subpoena recipient offered to provide aggregate sales figures). Other cases simply do not involve the same facts. *See, e.g., U.S. Gypsum Co. v. Lafarge N. Am., Inc.*, No. 03 C 6027, 2004 WL 816770, at *1 (N.D. Ill. Mar. 2, 2004) (considering, in a patent case, whether defendant may use an expert who consulted with competitors of the plaintiff or had to retain another expert).

have to produce a single document in this case and that every aspect of its trading on April 20 could never be adequately safeguarded by the Court's protective order. While Glencore has enjoyed many advantages in the business world and made billions of dollars while trading oil futures contracts, even Glencore is not above the law or immune to the legal obligations – shared by all citizens and businesses in the United States – to respond to legitimate and appropriately focused discovery requests in federal civil cases.

## CONCLUSION

For the foregoing reasons and those set forth in their motion, Vega and Spires respectfully request that the Court grant the motion and direct Glencore to produce documents responsive to the subpoena.

Dated: May 10, 2024

Respectfully submitted,

VEGA CAPITAL LONDON LIMITED AND ADRIAN SPIRES

By: /s/ Michael P. Kelly

Michael P. Kelly
AKERMAN LLP
750 Ninth Street, N.W., Suite 750
Washington, DC 20001
(202) 393-6222
michael.kelly@akerman.com

Elpitha B. Lambros
AKERMAN LLP
71 S. Wacker Drive, 47th Floor
Chicago, IL 60606
(312) 634-5700
elpitha.lambros@akerman.com

*Attorneys for Vega Capital London Limited and Adrian Spires*